IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. 23-cr-00070-JB |
| | * | |
| CRAIG D. PERCIAVALLE | * | |
| JOSEPH A. RUNKEL | * | |
| WILLIAM O. ADAMS | * | |

**UNITED STATES' RESPONSE
TO DEFENDANTS' MOTION TO CONTINUE TRIAL SETTING**

The United States of America, by and through Sean P. Costello, the United States Attorney for the Southern District of Alabama, and Glenn S. Leon, Chief of the Fraud Section, Criminal Division, Department of Justice, files this response in opposition to the defendants' motion to continue the trial setting. [Doc. No. 113] As detailed below, the United States does not believe any continuance is necessary at this time but does not oppose a continuance until April 2025. The October 2025 continuance requested by the defendants is unwarranted in light of the significant discovery efforts made by the United States in this case, and such a lengthy continuance is contrary to the Speedy Trial Act.

**BACKGROUND**

On March 30, 2023, a federal grand jury in the Southern District of Alabama returned an indictment against the defendants Craig D. Perciavalle, Joseph A. Runkel, and William O. Adams (hereinafter "Perciavalle," "Runkel," and "Adams" or collectively "the defendants"), charging them with one count of conspiracy to commit

1

wire fraud and wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1349, five counts of wire fraud, in violation of 18 U.S.C. §§ 1343, 2, and two counts of wire fraud affecting a financial institution, in violation of 18 U.S.C. §§ 1343, 2.  [Doc. No. 1]  The indictment alleges that, while serving as executives at Austal USA, a contractor for the United States Navy, the defendants concealed negative news about the company's performance of certain contracts with the Navy in an effort to defraud Austal Limited's shareholders and the investing public.  [*Id.*]

The defendants were arraigned on April 12, 2023. [Doc. Nos. 16, 21, 26] Between arraignment in April 2023 and September 2023, the case was delayed because of defense requests for more time to determine whether their attorneys could move forward with their representations.  *See* [Doc. Nos. 38, 72]  During a status conference on September 5, 2023, counsel for all defendants advised they would remain as counsel. [Doc. No. 81, pp. 4–5]

After defense counsel officially entered this case, the Court addressed trial scheduling.  *See* [Doc. No. 81]  The United States requested that trial be set for October 2024 and defense counsel proposed a trial date in February 2025.  [*Id.*, p. 7] Ultimately, the Court set the trial to begin in January 2025 — fifteen months after defense counsel entered the case and twenty-one months after the case was indicted. [*Id.*, p. 28]

Between September 5, 2023, and April 19, 2024, all parties moved forward with the expectation that trial in this case would begin in January 2025.  However, during a

status conference on April 19, 2024, defense counsel raised the prospect with the Court of needing to continue the trial setting. [Doc. No. 109] The basis for this potential continuance was defense counsels' concern that they would not be able to review the voluminous discovery and properly prepare for a trial starting in January 2025. [*Id.*]

Following the hearing, the United States and defense counsel discussed the possibility of a trial beginning in either April or May 2025. The United States noted that it did not oppose trial being set in either of those months, but explained that it would likely oppose trial set further out than that. The parties queried the Court about whether an April or May trial was possible with the Court's schedule, and the Court explained that this case could be tried in either April, July, or October 2025. Once again, the United States told defense counsel that it would not object to an April setting. Defense counsel indicated that a July setting was impossible due to other conflicts and have now filed a motion seeking this trial to be reset for October 2025 — approximately 30 months after this case was indicted. [Doc. No. 113]

The defendants' motion centers on their contention that they will be unable to review all of the discovery and properly prepare for trial as currently set for January 2025, and their belief that pushing the trial until April 2025 is insufficient as well. [*Id.*]

### THE UNITED STATES' DISCOVERY EFFORTS

The United States believes that any continuance is unnecessary in light of the extraordinary lengths it has gone to in this case to make discovery available and accessible to the defendants. The defendants have had access to the most essential

3

documents in the case since almost immediately after indictment, as detailed below.

The United States recognizes that there is voluminous evidence in this case, and therefore has taken many steps to assist defendants in their review. Immediately following this Court's entry of the protective order in this case on April 24, 2023, *see* [Doc. No. 35], the United States began making extensive efforts to provide prompt discovery and assist the defense with its review of that discovery. On April 25, 2023 and May 31, 2013, the prosecution team, in compliance with Rule 16 of the Federal Rules of Criminal Procedure, *Brady v. Maryland*, 373 U.S. 83 (1963), and the Court's April 12, 2023 Order, [Doc. Nos. 17, 22, 27], made two productions to the defendants that — combined — contained over 15 million records[1] Each production was accompanied by a cover letter and a detailed index with corresponding Bates numbers.

The United States produced these materials in an electronic, searchable format, with metadata, that was capable of being loaded into a discovery database for electronic review. Not knowing all of the defendants' likely defenses or lines of cross-examination of the United States' witnesses at trial, the United States exercised caution and took an expansive approach to discovery that went beyond the requirements of Rule 16 and *Brady*.

Given the voluminous discovery, the United States — on its own initiative — took additional steps beyond its ordinary process to assist in the defendant's review of

---

[1] The government filter team has also produced discovery to the defendants.

4

the documents produced in these first two productions. Along with its first production, the United States provided a file that identified approximately 35,000 of the documents that had been produced which the prosecution team had identified as among the most relevant to the United States' investigation to-date and, therefore, marked as "hot" in the United States' database. The United States also flagged the approximately 200,000 documents that the United States had marked as responsive to a search warrant that had been executed at Austal USA's headquarters.

The United States production of discovery was overinclusive — for example, the government obtained consent from Austal USA to provide **all** the materials seized during the search warrant despite the fact that the United States had only designated approximately 200,000 of the documents as responsive to the search warrant. Given the volume, the United States attempted to cull some of the irrelevant discovery. For example, the United States ran search terms over email data collected from the U.S. Navy (that spanned back to 1997) during the investigation and turning over only the documents that hit on the terms. When the defense requested all of the U.S. Navy email data, the United States complied, but the request added approximately two million additional documents to the discovery produced to the defense even though they likely have no relevance to the case.

In addition, in Productions 1 and 2 in April and May 2023, the United States provided separately foldered copies of the following key discovery materials in a format that could be reviewed without a discovery database, which was key because of the

5

defense representation over the summer of 2023 that they could not hire an e-discovery vendor until their representation issues were resolved:

- A folder of "Indictment Documents" containing approximately 200 documents (also separately produced in the load-ready file) that relate to specific allegations and counts in the Indictment.
- A folder containing all the interview reports of witnesses interviewed, including interview reports of certain defendants.
- A folder of "Interview Report Documents" containing 1,501 documents (also separately produced in the load-ready file) that are referenced in the interview reports.
- A folder containing the full NCIS and DCIS case files, which were updated by the case agents throughout the investigation with relevant investigative steps and activities.

All of these materials were provided in review-ready format, i.e., not requiring the use of any special technology beyond Adobe Acrobat to review the information. This could have allowed the defense to review key evidence, including all Reports of Interview for key witnesses and their corresponding documents as well as the investigative files, even before their issues of obtaining counsel and an e-discovery vendor were resolved in September 2023. Thus, the defense has had "meaningful access" to the vast majority of documents most central to the United States' case for far longer than the seven months that they cite in their motion. [Doc. No. 113, p. 12].

Since these initial productions of discovery, the United States has continued to provide discovery that it receives in load-ready, searchable formats along with detailed indices. The United States has also met and conferred with the defense and accommodated numerous defense requests throughout this process:

- The United States reproduced the "Interview Report Documents" in folders corresponding to each interview report to allow the defendants to easily access and locate each exhibit.

- In July 2023, in response to a defense request made because of the lack of an electronic review platform, the United States separately re-produced the documents previously identified as deemed "hot" and responsive to the Austal USA search warrant so that the defendants could load those documents into an electronic review platform and review them without loading the balance of materials produced in discovery. The United States updated this production to include newly tagged documents in the intervening period.

- The United States has produced grand jury transcripts early, along with grand jury exhibits used with the witnesses.

- The United States produced search warrant affidavits, despite being under no legal obligation to do so pursuant to *Brady*, *Giglio*, Rule 16, or the Jencks Act.

- The United States has worked with defense to address their questions about the MLAT process.

- The United States provided an overlay with its internal "issue coding" related to

7

approximately 30 "issue tags" related to the accounting fraud allegations in April 2024. The production of this coding provides the defense with the internal, deliberative work product of the United States in an effort to help in the review.

- The United States reproduced a collection of documents related to the Austal USA Board from the scheme period.

These discovery efforts were made against a backdrop of continuous conversations with counsel for each defendant about the case and the evidence against their clients. The United States provided a fulsome, four-hour reverse proffer walking Perciavalle through the evidence against him in December 2023 and has offered to discuss additional questions and issues that Perciavalle or his counsel might have following the reverse proffer. Prior to the indictment being returned in this matter, the United States provided detailed walk-throughs of information learned in the government's investigation to counsel for both Adams and Runkel, explaining the government's understanding of key concepts and documents. Adams ultimately proffered with the United States on two separate occasions in February 2021 and October 2022, and Runkel proffered with the United States on five separate occasions starting in 2019. In connection with these pre-indictment discussions, the United States provided significant pretrial discovery to Adams and Runkel. Furthermore, the United States even allowed Runkel access to its database pre-indictment to locate additional documents he and his counsel needed to better understand the issues underlying the government's case. In sum, Adams and Runkel, have been fully

engaged and aware of the substance of this investigation and the issues at hand for this trial since long before the indictment was returned in this case.[2]

Defendants' motion refers to "technical issues," including "overlapping Bates numbers among different productions, documents produced without native files, password-protected documents, documents produced without Bates numbers, documents produced as PDFs without searchable metadata, and e-mail documents produced without their attachments."  [Doc. No. 113, pp. 9–10]

The defendants highlight one example of a technical issue related to the **re-production** of "hot" and "responsive" documents that the United States made at defense request in July 2023 because of the defendants' inability to hire an e-discovery vendor at the time.  In April 2024, the defendants discovered an error in that July 2023 re-production of documents. The United States promptly worked to understand what caused the issue and determined that 1,090 of the documents that were re-produced had erroneous Bates stamps, a very limited issue that, again, does not impact what the defendants have available to review and could review during this time.  Essentially, the issue resulted in the defendants being provided the same document two times, just with a different identification number in 1,090 instances.  The United States offered two solutions to the defendants to resolve the issue, but the defendants opted to fix the

---

[2]  Tellingly, despite these extraordinary efforts to assist the defense with its review of discovery, the defendants represent in their motion that the efforts "have proved to be of limited practical value." [Doc. No. 113, p. 9]  It seems that no efforts the United States could make to assist the defense in this case would provide value in getting the defendants ready for trial.

9

problem themselves with their e-discovery vendor. Though the defendants say that this error meant they had to "suspend their review of the 'responsive' search warrant records for the two weeks it took to resolve the issue due to the risk of wasting resources reviewing records that were not actually 'responsive' to the search warrant," [Doc. No. 113, p. 10], they offer no reason why this means they couldn't continue other preparation for this case or continue reviewing the original, correct production. Overall, this technical issue that the defendants cite had no impact on whether they actually had discovery. Any impact this had on their ability to prepare for trial was solely because they made the choice to suspend their work preparing for trial unnecessarily. This issue also relates to **re-production** of documents that were provided in order to assist the defense while they did not have an e-discovery vendor and that the United States was under no obligation to provide.

The filing of the present motion alerted the United States to the defendants' view that the resolution of certain issues "remain[ed] outstanding" and has "delayed the defendants' ability to review the discovery." [Doc. No. 113, p. 10]. After learning that the defendants believe issues remain outstanding, the United States contacted counsel for the defendants to understand the outstanding issues further. The United States will continue to engage with the defendants to determine what outstanding issues remain and work to assist the defendants with these issues. In the United States' view, not one of the issues enumerated in the defendants' motion significantly impairs the ability of the defendants to continue to review the discovery that has been provided or means

10

that the defendants have not received discovery. Overall, the United States has made extraordinary efforts to assist the defense to prepare for trial in this case, and the technical issues that the defendants raise have no bearing on the defendants' access to the discovery itself. The United States will continue to work with the defendants to resolve the issues they have informed us remain outstanding at the time of this filing. But, again, in the United States' view, none of these issues should stop or significantly hamper the defendant's continued review of discovery and preparation for trial.

In summation, while discovery in this case is voluminous, the United States has made significant efforts to assist the defense in its review and there is nothing that the defense has proffered at this stage that warrants a trial date beyond April 2025, over two years from the date the indictment was returned.

## ANALYSIS

"[T]he public is the loser when a criminal trial is not prosecuted expeditiously, as suggested by the aphorism, 'justice delayed is justice denied.'" *United States v. Gambino*, 59 F.3d 353, 360 (2d Cir. 1995). " '[T]he [Speedy Trial] Act was designed with the public interest firmly in mind,' and 'there are many cases . . . in which the prosecution, the defense, and the court would all be happy to opt out of the Act, to the detriment of the public interest.' " *United States v. Ammar*, 842 F.3d 1203, 1206 (11th Cir. 2016) (quoting *Zedner v. U.S.*, 547 U.S. 489, 501-02 (2006)); *see also United States v. Lloyd*, 125 F.3d 1263, 1268 (9th Cir. 1997) ("Congress designed the Speedy Trial Act in part to protect the public's interest in the speedy administration of justice[.]").

Setting a trial date in April 2025, over **two years** since the indictment was returned in this case, fairly balances the defendants' rights to be prepared for trial with the public interest in the swift administration of justice. Public interest involves more than just "reducing defendants' opportunity to commit crimes while on pretrial release and preventing extended pretrial delay from impairing the deterrent effect of punishment." [Doc. No. 113, p. 11]. The Supreme Court detailed the societal interests in the swift administration of justice, which it noted "exists separate from, and at times in opposition to, the interests of the accused":

> The inability of courts to provide a prompt trial has contributed to a large backlog of cases in urban courts which, among other things, enables defendants to negotiate more effectively for pleas of guilty to lesser offenses and otherwise manipulate the system. In addition, persons released on bond for lengthy periods awaiting trial have an opportunity to commit other crimes. . . . Moreover, the longer an accused is free awaiting trial, the more tempting becomes his opportunity to jump bail and escape. Finally, delay between arrest and punishment may have a detrimental effect on rehabilitation.

*Barker v. Wingo*, 407 U.S. 514, 519–21 (1972). Furthermore, the Supreme Court explained:

> [A] deprivation of the [Speedy Trial] right may work to the accused's advantage. Delay is not an uncommon defense tactic. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof.

*Id.*; *see also United States v. Tombs*, 574 F.3d 1262, 1273 (10th Cir. 2009) ("It is the responsibility of not only the district court, but also the government, to protect the interests of the public by ensuring adherence to the requirements of the Speedy Trial

Act.") (citing *United States v. Wright*, 6 F.3d 811, 814 (D.C. Cir. 1993)).

Trying a case of this size and complexity two years after the indictment was returned is not unreasonable nor unprecedented in this district. *See, e.g., United States v. Kelley et al.*, 08-cr-00327-CG (S.D. Ala.) (six-week steroids and money laundering trial; arraignments on January 28, 2009, and trial began on January 4, 2010); *United States v. Waters, et al.*, 11-cr-00012-KD (S.D. Ala.) (complex multi-week healthcare kickbacks trial involving six defendants; indicted January 27, 2011, two superseding indictments followed, and trial began on February 3, 2012); *United States v. Sencan, et al.*, 13-cr-00117-WS (complex eight-day investment fraud trial with three defendants; indicted on May 30, 2013, and trial began December 12, 2013); *United States v. Couch et al.*, 15-cr-00088-CG, (S.D. Ala.) (extremely complex two-month long prescription drug and healthcare fraud trial; indicted April 30, 2015, two superseding indictments followed, and trial began January 4, 2017); *United States v. Jimenez*, 16-cr-00153-KD (S.D. Ala.) (complex multi-week visa fraud and money laundering trial; arraignment on December 21, 2016, and trial, after being delayed by a hurricane, began on October 2, 2017); *United States v. Owens, et al.*, 20-cr-00122-TFM (massive 42-defendant OCDETF case; indicted on October 8, 2020, and trial began on March 21, 2022); *United States v. Lacey et al.*, 23-cr-00101-KD (complex financial fraud case involving six defendants; indicted on May 24, 2023, and trial began on May 20, 2024).

The United States is prepared to try this case in January 2025. However, the United States recognizes there is voluminous discovery in this case, and therefore does

13

not oppose resetting this trial for April 2025. An April 2025 trial date will keep the parties on track to try this case in a reasonable time period. Setting a trial date in April 2025 will give the parties a reasonable target to prepare for and keep the case on track. In contrast, resetting this trial 15 months from now — and nearly 30 months after indictment — is unreasonable.

* * * * * * * * * *

## CONCLUSION

For all the reasons stated herein, this Court should deny the defendants' motion and keep the original January 2025 trial setting or grant the motion in part and reset this case for trial in April 2025.[3]  Doing so provides adequate time for trial preparation while also balancing the public interest in the prompt and efficient administration of justice.

Respectfully submitted this 24th day of June 2024.

| | |
|---|---|
| SEAN P. COSTELLO<br>UNITED STATES ATTORNEY | GLENN S. LEON<br>CHIEF, FRAUD SECTION |
| By: /s/ *Christopher J. Bodnar*<br>Christopher J. Bodnar<br>Assistant United States Attorney<br>United States Attorney's Office for the<br>Southern District of Alabama<br>60 South Royal Street, Suite 600<br>Mobile, Alabama 36602 | By: /s/ *Laura Connelly*<br>Kyle C. Hankey, Assistant Chief<br>Laura Connelly, Trial Attorney<br>Robert Spencer Ryan, Trial Attorney<br>Fraud Section<br>1400 New York Avenue, NW<br>Washington, D.C. 20005<br>Telephone: (202) 514-2000<br>Facsimile: (202) 514-0142 |

---

3      If this Court grants the defendants' motion and re-sets this trial for October 2025, then the United States respectfully requests that it also set a pretrial motions deadline for September 2024. The filing of pretrial motions does not require review of all of the discovery.  Having a pretrials motion deadline 18 months after indictment is reasonable and will keep this litigation moving forward.