**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

     v.

CRAIG D. PERCIAVALLE,
JOSEPH A. RUNKEL, and
WILLIAM O. ADAMS,

          Defendants.

Criminal Action No. 1:23-CR-00070-JB-N

**<u>DEFENDANTS' JOINT MOTION TO DISMISS THE INDICTMENT</u>**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ................................................................................................................. 1

ALLEGATIONS ..................................................................................................................... 2

LEGAL STANDARD ............................................................................................................. 3

ARGUMENT ........................................................................................................................... 4

    I.    The indictment is insufficient because it does not allege a scheme with money or property as its object. ........................................................................ 5

        A.    The alleged scheme did not aim to deprive its victims of anything, much less money or property. ...................................................... 6

        B.    Investors' interest in accurate information is not property under the wire fraud statute. ................................................................... 8

        C.    The indictment does not allege a scheme to defraud shareholders of money. ............................................................................................... 11

        D.    Share prices are not property. ................................................................ 12

        E.    The continued receipt of compensation and benefits is not property under the wire fraud statute. ....................................................... 14

        F.    Any money or property affected by the alleged scheme was incidental to rather than the object of the scheme. .................................. 16

        G.    The indictment does not allege a scheme aimed at the money or property of Banks 1 and 2. ...................................................................... 18

    II.    The indictment is insufficient because it does not allege a scheme to defraud under the wire fraud statute. .................................................................. 19

        A.    Because it does not allege an intent to harm by depriving the victim of property, the indictment sets forth at most a scheme to deceive, not a scheme to defraud. ...................................................... 19

        B.    The indictment does not allege a scheme to obtain anything. .................. 22

        C.    With regard to the allegation about defendants' compensation and benefits, the indictment does not allege convergence. ............................. 24

    III.    The deficiencies in the indictment cannot be cured by greater specificity. .......... 25

CONCLUSION ....................................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Carpenter v. United States,*
484 U.S. 19 (1987) ..................................................................................7, 10, 22

*United States v. Constantinescu,*
No. 4:22-cr-00612, 2024 WL 1221579 (S.D. Tex. Mar. 20, 2024) ...........12, 13, 14

*Ciminelli v. United States,*
598 U.S. 306 (2023) ............................................................................ *passim*

*Cleveland v. United States,*
531 U.S. 12 (2000) ..............................................................................8, 22, 25

*Kelly v. United States,*
590 U.S. 391 (2020) ............................................................................ *passim*

*Kousisis v. United States,*
No. 23-909 (S. Ct. Oct. 2, 2024) ...................................................................23

*McNally v. United States,*
483 U.S. 350 (1987) ............................................................................ *passim*

*SEC v. Craig D. Perciavalle, Joseph A. Runkel, and William O. Adams,*
Case No. 23-cv-00109 (Mar. 31, 2023) ...........................................................26

*Shaw v. United States,*
580 U.S. 63 (2016) ....................................................................................19

*United States v. Ali,*
620 F.3d 1062, 1070 (9th Cir. 2010) ..............................................................25

*United States v. Austal USA, LLC,*
Case No. 1:24-cr-00131-JB, Doc. 13 ..............................................................26

*United States v. Bailey,*
123 F.3d 1381 (11th Cir. 1997) ....................................................................25

*United States v. Ball,*
711 Fed. Appx. 838 (9th Cir. 2017) ...............................................................26

*United States v. Bankman-Fried,*
680 F. Supp. 3d 289 (S.D.N.Y. 2023) .............................................................11

*United States v. Barrow*,
    109 F.4th 521 (D.C. Cir. 2024) ................................................................................14, 16, 22

*United States v. Berdeal*,
    595 F. Supp. 2d 1326 (S.D. Fla. 2009) (Jordan, J.) ........................................................4, 27

*United States v. Bickers*,
    No. 22-13174, 2024 WL 3813993 (11th Cir. Aug. 14, 2024) ...................................15, 16, 18

*United States v. Bobo*,
    344 F.3d 1076 (11th Cir. 2003) ..................................................................................3, 4, 21

*United States v. Bouyea*,
    152 F.3d 192 (2d Cir. 1998).............................................................................................18

*United States v. Bradley*,
    644 F.3d 1213 (11th Cir. 2011) .........................................................................................5, 7

*United States v. Goodrich*,
    871 F.2d 1011 (11th Cir. 1989) .........................................................................................14

*United States v. Greenlaw*,
    84 F.4th 325 (5th Cir. 2023) ........................................................................................11, 20

*United States v. Griffin*,
    76 F.4th 724 (7th Cir. 2023) ............................................................................................18

*United States v. Guertin*,
    581 F. Supp. 3d 90 (D.D.C. 2022), *aff'd*, 67 F.4th 445 (D.C. Cir. 2023)...............................15

*United States v. Guertin*,
    67 F.4th 445 (D.C. Cir. 2023) ..................................................................................14, 15, 16

*United States v. Lew*,
    875 F.2d 219 (9th Cir. 1989) ...........................................................................................25

*United States v. Lewis*,
    67 F.3d 225 (9th Cir. 1995) .............................................................................................10

*United States v. Mahecha*,
    No. 19-cr-20738, 2024 WL 3326885 (S.D. Fla. July 8, 2024) ..............................................11

*United States v. Martin*,
    803 F.3d 581 (11th Cir. 2015) ..........................................................................................18

*United States v. Martín-Alfaro*,
    553 F. Supp. 3d 1 (D.P.R. 2021)........................................................................................27

*United States v. Miller*,
   953 F.3d 1095 (9th Cir. 2020) ............................................................20

*United States v. Nordlicht*,
   No. 16-cr-00640, 2023 WL 4490615 (E.D.N.Y. July 12, 2023) ..............................10

*United States v. Pelullo*,
   964 F.2d 193 (3d Cir. 1992)................................................................18

*United States v. Porat*,
   76 F.4th 213 (3d Cir. 2023) ...............................................................25

*United States v. Regent Office Supply Co.*,
   421 F.3d 1174 (2d Cir. 1970)...............................................................20

*United States v. Sadler*,
   750 F.3d 585 (6th Cir. 2014) ...............................................................9

*United States v. Sharpe*,
   438 F.3d 1257 (11th Cir. 2006) .........................................................2, 3

*United States v. Shellef*,
   507 F.3d 82, 109 (2d Cir. 2007)...........................................................21

*United States v. Takhalov*,
   827 F.3d 1307 (11th Cir. 2016) ...................................................... *passim*

*United States v. Tournant*,
   No. 22-cr-276-LTS, 2023 WL 8649893 (S.D.N.Y. Dec. 13, 2023) .......................12

*United States v. Wallach*,
   935 F.2d 445 (2d Cir. 1991), *abrogated by Ciminelli*, 598 U.S. 306 (2023)............9

*United States v. Walters*,
   997 F.2d 1219 (7th Cir. 1993) .....................................................22, 23, 24

*United States v. Ward*,
   486 F.3d 1212 (11th Cir. 2007) .........................................................4, 5

*United States v. Watkins*,
   42 F.4th 1278 (11th Cir. 2022) ...........................................................22

*United States v. Wheeler*,
   16 F.4th 805 (11th Cir. 2021) .............................................................21

*United States v. Yates*,
   16 F.4th 256 (9th Cir. 2021) .............................................9, 14, 15, 16

*United States v. Ying Lin*,
   270 F. Supp. 3d 631 (E.D.N.Y. 2017) .................................................................27

**Statutes**

15 U.S.C. § 78j(b) ....................................................................................................26

18 U.S.C. § 1341 .........................................................................................5, 6, 22, 23

18 U.S.C. § 1343 ................................................................................................ *passim*

18 U.S.C. § 1348 ......................................................................................................12

18 U.S.C. § 1349 ...................................................................................................2, 12

18 U.S.C. § 3293(2) .................................................................................................18

**Other Authorities**

Fed. R. Crim. P. 7(c) .................................................................................................3

Fed. R. Crim. P. 12(b)(3)(B)(v) ............................................................................1, 3

Defendants Craig Perciavalle, Joseph Runkel, and William Adams (collectively, "defendants"), by their counsel, hereby jointly move the Court, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), to dismiss the indictment with prejudice. In support of this joint motion, defendants rely on the following points and authorities, and any other points and authorities that may be cited in their reply filing and at a hearing on this motion.

## **INTRODUCTION**

The charging document in this case alleges a good deal of conduct by the defendants, none of which constitutes wire fraud or conspiracy to commit wire fraud. Over the past several years, including *after* the indictment was filed here, the Supreme Court has significantly clarified the scope of the wire fraud statute. The high court has made clear that a scheme to deprive the victim of "potentially valuable economic information necessary to make discretionary economic decisions" is not a scheme to defraud within the meaning of 18 U.S.C. § 1343. *Ciminelli v. United States*, 598 U.S. 306, 309 (2023) (internal quotation marks omitted). It has also made clear that a scheme that results in or contemplates a deprivation of a traditional property interest, like money, is not a wire fraud scheme if the loss to the victim was an "incidental byproduct" of the scheme. *Kelly v. United States*, 590 U.S. 391, 402 (2020). On the contrary, it is only where a scheme to deceive "had the 'object' of obtaining [the victim's] money or property" that it falls within the ambit of criminal wire fraud. *Id.* at 399. And long before those clarifications, relevant as they are to the indictment at hand, the Supreme Court held definitively that the mail and wire fraud statutes are "limited in scope to the protection of property rights." *McNally v. United States*, 483 U.S. 350, 360 (1987). The indictment here is fatally deficient under these cases and under Eleventh Circuit precedents.

The defendants, simply, are not alleged to have defrauded anyone of anything, much less money or property. They are not alleged to have schemed to deprive another of property or to

obtain property for themselves to which they were not entitled. They are alleged only to have schemed to *deceive*, and the wire fraud statute does not extend to deceptions alone. Because the indictment does not state a wire fraud offense, it must be dismissed in its entirety.

## ALLEGATIONS

According to the indictment, the defendants were employees of Austal USA, LLC ("Austal USA"), a shipbuilder based in Mobile, Alabama, that builds ships for the U.S. Navy, including the Navy's Independence-class Littoral Combat Ships ("LCS").[1] Austal USA is a subsidiary of Austal Limited (also referred to as "Austal"), a publicly-traded Australian shipbuilding company that lists its shares on the Australian Securities Exchange ("ASX") and also had an American Depository Receipt ("ADR") facility that traded on the over-the-counter market in the United States. Doc. 1 (Indictment), PageID.1-2 at ¶¶ 1-5.

The indictment charges the defendants with wire fraud, wire fraud affecting a financial institution, and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349, based on allegations that the defendants intentionally provided to the Austal USA board, Austal Limited, and the company's independent auditors false estimates of the future costs necessary to complete certain LCS ships, resulting in Austal Limited's over-recognition of revenue and profits in financial reporting periods between 2013 and mid-2016. *Id.* at PageID.6-11, ¶¶ 15-30.

In December 2015, Austal Limited reported to shareholders that Austal USA's earnings in FY 2016 were expected to be lower than in FY 2015. Then, in July 2016, Austal Limited reported an Earnings Before Interest and Taxes ("EBIT") loss for FY 2016, due primarily to a $115 million one-off write-back of work in progress. Explaining the basis for the write-back, Austal Limited

---

[1] For purposes of a motion to dismiss the indictment for failure to state an offense, the allegations in the indictment are treated as true and viewed in the light most favorable to the government. *See United States v. Sharpe*, 438 F.3d 1257, 1258-59 (11th Cir. 2006).

stated that the estimated cost of construction of the LCS vessels had increased and that the change in estimate meant that too much profit and revenue had been attributed to already-completed work. These two announcements are alleged to have had a significant negative impact on the share price of Austal Limited's stock. *Id.* at PageID.11, ¶¶ 31-32.

According to the indictment, the purpose of the scheme to defraud was for the defendants "to mislead Austal Limited's shareholders and the investing public about Austal USA's financial condition and the performance of the LCS program in order to (a) maintain and increase the share price of Austal Limited's stock; and (b) unjustly enrich [the defendants] and others through the continued receipt of compensation, stock, and other benefits." *Id.* at PageID.5, ¶ 14.

Finally, the alleged scheme purportedly affected financial institutions because Austal Limited provided the misleading FY 2014 and FY 2015 financial statements to two banks prior to entering a syndicated facility agreement ("SFA") with the banks for approximately $105 million in October 2015. The banks required the financial information from Austal Limited in order to assess the level of credit risk and fees they would charge in connection with the SFA. *Id.* at PageID.12-13, ¶¶ 34-37.

## LEGAL STANDARD

An indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). A defendant may move to dismiss an indictment based on the grounds that it fails to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v).

"In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes." *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006) (emphasis in original). "For an indictment to be valid, it must 'contain the elements of the offense intended to be charged, and sufficiently apprise the defendant of what he must be prepared to meet.'" *United States v.*

*Bobo*, 344 F.3d 1076, 1083 (11th Cir. 2003) (quoting *Russell v. United States*, 369 U.S. 749, 763 (1962)).  While an indictment may track the language of the applicable statute, it still must "state the offense with particularity" and contain "a statement of the facts and circumstances [that] will inform the accused of the specific offense, coming under the general description, with which he is charged.'"  *Id.* (quoting *Russell*, 369 U.S. at 765).  An indictment that does not "apprise the defendant with reasonable certainty . . . of the nature of the accusation against him is defective" even if it "follow[s] the language of the statute."  *Id.* (quoting *Russell*, 369 U.S. at 765).  And, "an indictment fails as a matter of law if the defendants' charged conduct, even if true, does not violate the statute or provision cited in the indictment."  *United States v. Berdeal*, 595 F. Supp. 2d 1326, 1328 (S.D. Fla. 2009) (Jordan, J.) (citing *United States v. Madera*, 528 F.3d 852, 859 (11th Cir. 2008), and *Bobo*, 344 F.3d at 1086).

## ARGUMENT

The scheme alleged in the indictment does not violate the wire fraud statute, and therefore the indictment must be dismissed.  Wire fraud requires that a person "intentionally participates in a scheme or artifice to defraud another of money or property."  *United States v. Ward*, 486 F.3d 1212, 1222 (11th Cir. 2007).  For two distinct reasons, the facts alleged in the indictment do not state a wire fraud offense.

*First*, the indictment impermissibly alleges a scheme that had neither money nor property as its object.  Indeed, the indictment is devoid of any allegation that any person or entity was deprived, or intended to be deprived, of anything at all.  Under a generous reading, it comes close to alleging that "shareholders and the investing public" were deprived of accurate information, but the Supreme Court has recently held that any such right is not a recognized property interest within the meaning of the wire fraud statute.

4

*Second*, while the indictment may set out a scheme to deceive, it does not allege a scheme to defraud.  There is no ambiguity over whether a scheme to deceive alone may violate the wire fraud statute.  It clearly may not.  Without a concomitant intent to harm, that is "to obtain, by deceptive means, something to which [the defendant] was not entitled," there is no scheme to defraud and therefore no wire fraud.  *United States v. Bradley*, 644 F.3d 1213, 1240 (11th Cir. 2011).  The indictment is silent as to any such intent to harm.

The infirmity in the indictment is not its lack of specificity; it is that the indictment specifically alleges conduct that—as a matter of law—is not an offense under the statutes in question.  Because the indictment fails to state an offense, and because its defects cannot be remedied, it must be dismissed with prejudice.

## I.    The indictment is insufficient because it does not allege a scheme with money or property as its object.

Since 1987, when the Supreme Court decided *McNally v. United States*, it has been clear that the wire fraud statute prohibits only those schemes which have money or property as their object.  483 U.S. 350, 360 (1987).[2]  The wire fraud statute provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation . . . affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

---

[2] *McNally* addressed the mail fraud statute, 18 U.S.C. § 1341, but its holding (like those of other judicial decisions construing the meaning of "scheme to defraud") applies equally to the wire fraud statute, 18 U.S.C. § 1343.  *See Kelly v. United States*, 590 U.S. 391, 398 (2020); *United States v. Ward*, 486 F.3d 1212, 1221-22 (11th Cir. 2007).

18 U.S.C. § 1343. In *McNally*, the Court explained that the second clause of the statute—"or obtaining money or property by means of false or fraudulent pretenses, representations, or promises"—rather than setting forth an alternative type of scheme, simply clarifies the meaning of the first clause prohibiting schemes "to defraud." *See id.* at 358-60. For nearly four decades, therefore, it has been black letter law that: (i) a wire fraud scheme is a scheme to "wrong[]" another "in his property rights," *id.* at 358 (internal quotation marks and citation omitted), and (ii) "[t]he wire fraud statute thus prohibits only deceptive 'schemes to deprive the victim of money or property,'" *Kelly*, 590 U.S. at 398 (cleaned up) (quoting *McNally*, 483 U.S. at 356). The indictment here alleges a scheme with neither money nor property as its object. That flaw is fatal and requires dismissal.

### A.    The alleged scheme did not aim to deprive its victims of anything, much less money or property.

The indictment concisely states the purpose of the alleged scheme to defraud: it was "to mislead Austal Limited's shareholders and the investing public about Austal USA's financial condition and the performance of the LCS program in order to (a) maintain and increase the share price of Austal Limited's stock; and (b) unjustly enrich [the defendants] and others through the continued receipt of compensation, stock, and other benefits." Doc. 1 (Indictment), PageID.5 at ¶ 14. It is clear who the alleged victims are: Austal Limited's shareholders and the investing public. The problem is that the indictment does not allege a scheme aimed at obtaining the money or property of those victims. Indeed, it does not specifically identify *any* object that the defendants schemed to obtain from any victim.

There is no question that a perpetrator of wire fraud must have money or property as the object of his fraud. *See McNally*, 483 U.S. at 360 ("[W]e read § 1341 as limited in scope to the protection of property rights."); *Kelly*, 590 U.S. at 398 (wire fraud statute "prohibits only deceptive

schemes to deprive the victim of money or property[, so] the Government had to show not only that Baroni and Kelly engaged in deception, but that an object of their fraud was property.") (internal quotation marks and citations omitted); *Carpenter v. United States*, 484 U.S. 19, 25 (1987) (obtaining "money or property" is "a necessary element" of wire fraud); *Bradley*, 644 F.3d at 1238 (wire fraud requires that a person "intentionally participates in a scheme or artifice to defraud another of money or property" (quoting *Ward*, 486 F.3d at 1222)). Here, the indictment simply does not allege that the Austal shareholders and investing public were defrauded of any money or property.

The indictment's failure to allege that the object of the scheme was money or property is not just a technicality; it omits a fundamental element separating schemes to defraud someone of money or property (prohibited) from schemes to defraud someone of something other than money or property (not prohibited, at least not by 18 U.S.C. § 1343). Before the Supreme Court decided *McNally*, many defendants were convicted for defrauding victims of non-property intangible rights. In *McNally*, the Supreme Court clarified that the wire fraud statute simply does not extend to non-property frauds. Even schemes that are unquestionably deceitful do not constitute *wire fraud* unless they have property as their object. *See Kelly*, 590 U.S. at 393 ("The evidence the jury heard no doubt shows wrongdoing—deception, corruption, abuse of power. But the federal fraud statutes at issue do not criminalize all such conduct. Under settled precedent, the officials could violate those laws only if an object of their dishonesty was to obtain the Port Authority's money or property."). If the indictment does not allege what the object of the fraud is, then *ipso facto* the indictment has not alleged a wire fraud scheme. *See id.* at 398 (explaining the government was required under § 1343 to "show not only that [defendants] engaged in deception, but that an 'object

of their fraud was property.'" (cleaned up) (quoting *Cleveland v. United States*, 531 U.S. 12, 26 (2000))).

**B.    Investors' interest in accurate information is not property under the wire fraud statute.**

To the extent the indictment might be read as describing a scheme to deprive Austal Limited shareholders and the investing public of accurate information regarding the company's financial performance and the performance of the LCS shipbuilding program, that does not articulate a property interest cognizable under the wire fraud statute.  To be clear, the indictment does not allege that the object of the scheme was to deprive shareholders or the public of *anything*, even an intangible interest in information or a "right to control" the disposition of their assets.  But by stating that the purpose of the scheme was to "mislead" Austal Limited shareholders and the investing public, the allegations imply that existing and potential shareholders may have been deprived of full and accurate information which they could have used to make discretionary decisions about whether to buy or sell Austal Limited securities.  The Supreme Court, however, has conclusively foreclosed the viability of a wire fraud theory premised on such a deprivation.

Over the past quarter century, the high court has again and again turned back efforts by prosecutors to expand the scope of property protected by the mail and wire fraud statutes beyond the traditionally recognized property interests.  In *Cleveland v. United States*, the Court rejected the government's arguments that state gambling licenses were property within the meaning of the mail fraud statute, because the theories proffered by the government "stray[ed] from traditional concepts of property."  531 U.S. 12, 24 (2000).  Then, in *Kelly v. United States*, the Court held that a scheme by allies of the New Jersey governor to realign the toll lanes of the George Washington Bridge in order to snarl traffic in Fort Lee, New Jersey, and thereby punish the Fort Lee mayor for failing to support the governor's reelection bid, did not have money or property as its object, even

though the scheme involved the control of property (the bridge) and required the use of state funds to implement. 590 U.S. at 399-400.

Finally, and most directly relevant to the facts of this case, after the indictment was filed here the Court decided *Ciminelli v. United States*, unanimously holding that "the wire fraud statute reaches only traditional property interests" and "[t]he right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest." 598 U.S. at 316. In so holding, the Court explicitly overruled a line of Second Circuit cases that stated otherwise. *Id.* at 314-15. Those cases rested on a now-invalidated theory that "the withholding or inaccurate reporting of information that could impact on economic decisions can provide the basis for a mail fraud prosecution." *United States v. Wallach*, 935 F.2d 445, 463 (2d Cir. 1991), *abrogated by Ciminelli*, 598 U.S. 306 (2023). The Second Circuit had reasoned that "given the important role that information plays in the valuation of a corporation, the right to complete and accurate information is one of the most essential sticks in the bundle of rights that comprise a stockholder's property interest." *Id.* Addressing this "bundle of sticks" theory head-on, the Supreme Court stated unequivocally that "the right to information necessary to make informed economic decisions, while perhaps useful for protecting and making use of one's property, has not itself traditionally been recognized as a property interest." *Ciminelli*, 598 U.S. at 314 n.4.

*Ciminelli* confirmed what some courts outside the Second Circuit had earlier recognized: depriving a person of accurate information does not a wire fraud violation make. *See, e.g.*, *United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014) ("But the statute is limited in scope to the protection of *property rights*, and the ethereal right to accurate information doesn't fit that description.") (internal quotation marks and citation omitted) (emphasis in original); *United States v. Yates*, 16 F.4th 256, 265 (9th Cir. 2021) ("The accurate-information theory is legally

insufficient. . . .  Although a property right in trade secrets or confidential business information can constitute 'something of value,' *Carpenter v. United States*, 484 U.S. 19, 26 (1987), 'the right to make an informed business decision' and the 'intangible right to make an informed lending decision' cannot, *United States v. Lewis*, 67 F.3d 225, 233 (9th Cir. 1995).").

A district court decision issued in the aftermath of *Ciminelli* illustrates both its import and its relevance to this case.  In *United States v. Nordlicht*, the court reversed the defendants' convictions for conspiracy to commit wire fraud.  No. 16-cr-00640, 2023 WL 4490615 (E.D.N.Y. July 12, 2023).  The convictions were premised on misrepresentations made by the defendants, who were affiliated with a hedge fund, to bondholders of a troubled oil-and-gas company in which the hedge fund was heavily invested.  The defendants' misrepresentations were aimed at persuading the bondholders to tender their bonds, in furtherance of the defendants' plan to address the company's financial problems and thereby protect the value of the hedge fund's investment in the company.  *Id.* at *4.  But, critically, there was "no evidence that defendants intended to steal from the bondholders."  *Id.*  The court concluded that because the defendants lacked "an intent to deprive the victim[s] of money or property," their wire fraud conspiracy convictions could not be sustained.  *Id.* at *5 (quoting *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019)).  In so holding, the court observed that, at most, the defendants intended to deprive the bondholders of information that could have affected their decisions about whether to tender their bonds.  *Id.* at *6.

Likewise, the indictment here sets out a purported scheme which—to the extent it may be construed to have had any object at all—aimed to deprive Austal Limited shareholders and the investing public of exactly the "right to information necessary to make informed economic decisions" that the Supreme Court held is not "property."  Indeed, the alleged "purpose of the scheme to defraud" was to "mislead Austal Limited's shareholders and the investing public about

Austal USA's financial condition and the performance of the LCS program."  Doc. 1 (Indictment), PageID.5 at ¶ 14.  In describing the scheme to defraud, the indictment states that the defendants took actions to conceal growing costs in the LCS program, thereby causing false and misleading information to be provided to investors.  *Id.* at PageID.6-11, ¶¶ 15-33.  If the purpose of the scheme to was to "mislead" investors, then it was "information" of which investors were deprived.  The Supreme Court's decision in *Ciminelli* is precisely on point: information is not property, even when it is important to making economic decisions.

### C.    The indictment does not allege a scheme to defraud shareholders of money.

Here, no facts have been alleged that come close to suggesting that the object of the deceptive scheme was to obtain shareholders' money or property.  Not only is there no allegation that the defendants intended to obtain shareholders' money for themselves; there is also no allegation that the defendants intended to obtain money for Austal.  Austal Limited shares were traded on the secondary market, and the indictment does not state or suggest that the company raised equity capital during the period of the fraud.  The scheme alleged here therefore differs significantly from cases where defendants misled investors in order to obtain their money.  *See, e.g.*, *United States v. Greenlaw*, 84 F.4th 325, 345 (5th Cir. 2023) (investment fund executives' convictions upheld where "new investor money was the object of [their] operation because it was only after the [new] money was transferred [into the funds] that they were able to pay distributions" to earlier investors); *United States v. Bankman-Fried*, 680 F. Supp. 3d 289, 307 (S.D.N.Y. 2023) ("Specifically, the indictment alleges that the defendant schemed to misappropriate 'billions of dollars' of FTX customers' funds . . . and used those funds 'to pay expenses and debts of Alameda, and to make investments, and for other purposes.'  Thus, the indictment sufficiently alleges a scheme to defraud, an object of which was obtaining customer funds, which plainly constitute both 'money' and 'property' within the meaning of Section 1343."); *United States v. Mahecha*, No. 19-

cr-20738, 2024 WL 3326885, at *8 (S.D. Fla. July 8, 2024) (indictment against real estate developer sufficiently alleged wire fraud where defendant was "charged with scheming to obtain money" and the indictment stated that it was a purpose of the scheme for the defendant to "obtain investor funds" by, *inter alia*, "soliciting . . . millions of dollars from investors," and "misappropriating and converting investor funds for his own benefit"); *United States v. Tournant*, No. 22-cr-276-LTS, 2023 WL 8649893, at *9 (S.D.N.Y. Dec. 13, 2023) (indictment against investment fund portfolio manager sufficiently alleged wire fraud when it stated that the goal of the scheme was to "attract and retain capital" in the portfolio funds). Unlike schemes to obtain money from investors, the fraud alleged here was a fraud to *mislead* investors, and to the extent it aimed to deprive them of anything, that "thing" was information.

### D.    Share prices are not property.

The indictment's allegation that the purpose of the scheme was to mislead investors "in order to maintain and increase the share price of Austal Limited's stock" does not state a property fraud because share prices are not property. Rather, they reflect the value of property held by shareholders. That the scheme alleged was one to "mislead Austal Limited's shareholders" with the goal of *maintaining and increasing* the price of their shares further underlines that the object of the fraud was not to obtain any Austal shareholder's property.

This distinction was made by another district court earlier this year, when it dismissed an indictment charging securities fraud under 18 U.S.C. §§ 1348 and 1349 in light of the Supreme Court's holding in *Ciminelli*. *United States v. Constantinescu*, No. 4:22-cr-00612, 2024 WL 1221579 (S.D. Tex. Mar. 20, 2024). There, the alleged "scheme to defraud" was a pump-and-dump scheme in which the defendants disseminated false, positive information about certain securities to their many social media followers with the goal of "pumping" the price of those securities, at which point the defendants secretly sold their shares, profiting by approximately $114

million. *Id.* at \*2. Applying *Ciminelli*, the court dismissed the indictment, holding that it did not allege a scheme to deprive the defendants' social media followers of money, but only to deprive them of accurate information with the goal of inflating stock prices to benefit the defendants. *Id.* at \*6.

The *Constantinescu* court observed that "[t]he most glaring issue in the Indictment is the dearth of factual allegations that connect the alleged 'scheme' to the deprivation of the other investors' traditional property interests (i.e., allegations demonstrating that the object of the scheme involved harm to victims)." *Id.* at \*4. Instead, "the language of the Indictment indicate[d] that losses to victims happened incidentally (i.e., 'at the expense of') rather than as the 'object of' the alleged scheme." *Id.* at \*5. The scheme as pleaded was not "aimed at harming someone's traditional property right" but instead was "totally indifferent to its effect on the alleged victims," many of whom may have made money as a result of the scheme. *Id.* "Unlike a traditional fraud case," the court observed, "in which the victim directly surrenders their property to the defendant (or an entity in the defendant's control), the investors here surrendered their property to the stock market at market prices, and in return, received the benefit of the bargain in the form of securities." *Id.* at \*6. The scheme, therefore, "did not deprive investors of their money or property through any misrepresentation; the misrepresentations deprived them only of accurate information necessary to make discretionary economic decisions." *Id.* Accordingly, the court dismissed the indictment.

The indictment in this case is even more clearly deficient than that in *Constantinescu*. Unlike in that case, the defendants here are not alleged to have schemed to maintain and increase the share price so that they or Austal might profit from those increased prices. They are not, for example, alleged to have aimed to increase the price of Austal Limited shares because they held

Austal shares themselves and would benefit from higher prices.  They certainly are not alleged to have made over $100 million (as the *Constantinescu* defendants were) by misleading Austal investors; in fact, other than continued receipt of their compensation as Austal USA employees, they are not alleged to have profited (or intended to profit) from the scheme at all.  In short, the *Constantinescu* court dismissed an indictment that went further toward alleging a traditional property interest than the indictment here does.  That case is illustrative in explaining why a scheme to affect share prices is not a scheme to deprive shareholders of money or property.[3]  When, as alleged here, shareholders are misled in order to affect the price of market-traded shares, the *only* thing the shareholders are deprived of is information.  By extension, there is no corresponding object of obtaining those shareholders' money or property.

> **E.**    **The continued receipt of compensation and benefits is not property under the wire fraud statute.**

The second prong of the alleged scheme, "unjust enrichment" of the defendants through their "continued receipt of compensation, stock, and other benefits," also cannot serve as the basis for the wire fraud charges because it relies on the legally insufficient salary-maintenance theory. *See Yates*, 16 F.4th at 267-68; *United States v. Barrow*, 109 F.4th 521, 529 (D.C. Cir. 2024); *United States v. Guertin*, 67 F.4th 445, 451 (D.C. Cir. 2023).  *See also United States v. Goodrich*, 871 F.2d 1011, 1013-14 (11th Cir. 1989) (rejecting argument that the regular payment of salaries and incidental expenses was a property interest that could be the object of the alleged scheme to defraud).

---

[3] This is the case even if the government were to attempt to argue now (as it maintained in *Constantinescu*) that the defendants sought to profit in some way from increased share prices.  As *Constantinescu* explains, any alleged shareholder losses are merely incidental to a scheme that seeks such benefits as its object and, accordingly, cannot support a scheme to defraud.

An employee's scheme to deceive his employer so that the employee can continue to draw his salary and benefits does not constitute wire fraud. *See Yates*, 16 F.4th at 266-68. If "the employer receives the benefit of its bargain, the employee's lie merely deprives the employer of honesty as such, which cannot serve as the predicate for a wire fraud conviction." *Guertin*, 67 F.4th at 451. *See also United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016) (explaining that the requisite intent to defraud requires the defendant to intend "to obtain, by deceptive means, something to which [the defendant] is not entitled" (quoting *Bradley*, 644 F.3d at 1240)). An allegation that a defendant "merely sought to 'maintain' his salary"—or, put differently, that he sought to ensure his "continued receipt of compensation"—is insufficient. *Compare United States v. Guertin*, 581 F. Supp. 3d 90, 92-93 (D.D.C. 2022) (dismissing indictment alleging that "[i]t was the purpose of the scheme to defraud for the defendant . . . to unlawfully enrich himself *by maintaining his State Department employment and salary*.") (emphasis in original)*, aff'd*, 67 F.4th 445 (D.C. Cir. 2023), *with* Doc. 1 (Indictment), PageID.5 at ¶ 14 ("[t]he purpose of the scheme to defraud was" to "unjustly enrich [the defendants] and others through the *continued receipt* of compensation, stock, and other benefits") (emphasis added). Accordingly, an indictment that alleges that a defendant "sought to maintain his pre-existing salary does not state an offense under § 1343." *Guertin*, 581 F. Supp. 3d at 96.

These decisions have not been lost on the Department of Justice. In a recent case before the Eleventh Circuit, the government conceded the post-conviction withdrawal of wire fraud charges premised on a scheme aimed at the defendant's continued receipt of her salary. *United States v. Bickers*, No. 22-13174, 2024 WL 3813993, at *1 (11th Cir. Aug. 14, 2024). In its brief, the government cited *Kelly*, *Ciminelli*, *Yates*, and *Guertin* in noting that "recent Supreme Court precedent and out-of-circuit decisions have rejected wire fraud prosecutions premised on lies

which allow an employee to maintain employment and that are only indirectly related to the money or property obtained." Brief of United States at 44, *United States v. Bickers*, No. 22-13174 (11th Cir. Aug. 14, 2024), Doc. 29. "On reconsideration and in light" of these developments, the government withdrew its prosecution of the wire fraud counts. *Id.* at 46.

Like in *Yates*, *Guertin*, *Barrow*, and *Bickers*, the indictment here does not allege that the object of the defendants' scheme was to obtain a higher salary or increased benefits. *See Yates,* 16 F.4th at 266 (noting the "difference between a scheme whose object is to obtain a new or higher salary and a scheme whose object is to deceive an employer while continuing to draw an existing salary"). To the contrary, the indictment clearly states that the defendants schemed to ensure their "continued receipt" of compensation. Doc. 1 (Indictment), PageID.5 at ¶ 14. Furthermore, the indictment does not allege that there was any discretionary component to the defendants' compensation package or that it was tied in any way to the financial metrics impacted by their alleged scheme. *See Yates*, 16 F.4th at 268. The allegations regarding the defendants' scheme to "unjustly enrich [themselves] and others through the continued receipt of compensation, stock, and other benefits" therefore fits squarely within the boundaries of the invalidated salary-maintenance theory. In fact, the allegations at bar are analogous to the insufficient allegations in *Yates*, where the defendants misrepresented the financial condition of their employer (a bank) in order to ensure that they received their salaries and bonuses. *Id.* at 266. Accordingly, to the extent the wire fraud counts rely on an alleged scheme to ensure the defendants' continued receipt of compensation, they must be dismissed.

### F.  Any money or property affected by the alleged scheme was incidental to rather than the object of the scheme.

A scheme that does not have money or property as its object is not a wire fraud scheme, even if the scheme entails a foreseen property deprivation. The "property must play more than

some bit part in a scheme: It must be an 'object of the fraud.' Or put differently, a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme." *Kelly*, 590 U.S. at 402 (internal citations omitted). The indictment here clearly alleges a scheme to mislead investors, and any possible property loss implicated by the scheme—for example, money paid by new investors to buy Austal shares, money lost by existing shareholders following the July 2016 write-back, or money paid by Austal USA in the form of compensation and benefits to the defendants—was incidental to the objective of the scheme.[4]

The indictment does not allege that the *object* of the fraud was to deprive shareholders of money, Austal USA of the defendants' salaries, or any other person of any other property, and the inquiry must end there. The indictment's allegations that the Austal Limited share price was "negatively impacted" by announcements to the market in 2015 and 2016 do not change that conclusion. Certainly, the indictment does not allege that the purpose of the scheme was to cause a loss to investors, and "[t]he victim's loss must be an objective of the deceitful scheme rather than a byproduct of it." *Id.* at 402 n.2 (quoting *United States v. Walters*, 997 F.2d 1219, 1226 (7th Cir. 1993)).

Likewise, the indictment explicitly alleges a scheme to defraud shareholders and the investing public, not Austal USA, the defendants' employer. *See* Doc. 1 (Indictment), PageID.12 at ¶ 34 ("[T]he purpose of the scheme was to defraud shareholders and the investing public."). Even if the defendants were "unjustly enriched" by continuing to receive their salary and benefits despite their alleged lack of honesty, that deprivation of their employer's property was incidental to the objective of the scheme, impermissibly premised on Austal USA's "right to control" its

---

[4] Further, none of these theoretical deprivations is squarely alleged in the indictment.

property, or both.  *See Bickers*, 2024 WL 3813993, at *1 (government voluntarily withdrew wire fraud counts based on scheme to receive salary, citing *Kelly* and *Ciminelli*).

### G.    The indictment does not allege a scheme aimed at the money or property of Banks 1 and 2.

The allegations relating to Bank 1 and Bank 2 are irrelevant to this motion to dismiss because those allegations do not set forth the scheme to defraud.  Doc. 1 (Indictment), PageID.12-13 at ¶¶ 34-38.  Rather, they are necessitated by Counts 7 and 8, charging wire fraud affecting a financial institution.  Those counts involve more severe penalties, *see* 18 U.S.C. § 1343 (thirty-year maximum term of imprisonment instead of twenty-year maximum), and a longer statute of limitations, *see* 18 U.S.C. § 3293(2) (ten years rather than five years), than the other wire fraud counts, but in order for the enhanced penalties and limitations period to apply, the government must allege and prove that the scheme to defraud set forth earlier in the indictment "affected" a financial institution.

The indictment is explicit that it does not allege a scheme to defraud Bank 1 or Bank 2.  To wit, Counts 7 and 8 incorporate the same "purpose" of the scheme as that alleged in the remaining counts (i.e., to "mislead Austal Limited's shareholders and the investing public"), and the indictment introduces the allegations regarding the banks by stating: "While the purpose of the scheme was to defraud shareholders and the investing public, it also affected financial institutions, including Bank 1 and Bank 2."  Doc. 1 (Indictment), PageID.5, 12, 18 at ¶¶ 14, 34, 53.  Courts have recognized that a wire fraud scheme may affect a financial institution without the financial institution or its property being the object of the fraud.  *See United States v. Martin*, 803 F.3d 581, 590 (11th Cir. 2015).  *See also United States v. Griffin*, 76 F.4th 724, 736-37 (7th Cir. 2023); *United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998); *United States v. Pelullo*, 964 F.2d 193, 215-16 (3d Cir. 1992).  The indictment here is purposefully clear that it does not allege a scheme

to defraud Banks 1 and 2, and therefore the banks' money does not and cannot supply the property element missing from the scheme as alleged.

Accordingly, for all the reasons set forth above, the eight counts in the indictment do not allege a scheme with money or property as its object, and therefore the Court should dismiss the indictment with prejudice for failure to state an offense.

## II.    The indictment is insufficient because it does not allege a scheme to defraud under the wire fraud statute.

In addition to not alleging money or property as the object of the defendants' scheme, the indictment fails to allege that the defendants engaged in a *scheme to defraud* within the meaning of the wire fraud statute. The indictment does not allege the requisite intent to harm that distinguishes a scheme to defraud from a scheme that only aims to deceive. The indictment also fails to allege intent on the part of the defendants to obtain something of value from any victim. Finally, the scheme alleged regarding the defendants' continued receipt of compensation does not conform to the principle of convergence: that the parties alleged to have been deceived (in this case, Austal Limited shareholders and the investing public) were the same parties who were allegedly defrauded.

### A.    Because it does not allege an intent to harm by depriving the victim of property, the indictment sets forth at most a scheme to deceive, not a scheme to defraud.

A person who has schemed only to deceive has not engaged in a scheme to defraud. This is so because "there is a difference between deceiving and defrauding: to *defraud*, one must intend to use deception to cause some injury; but one can *deceive* without intending to harm at all." *United States v. Takhalov*, 827 F.3d 1307, 1312 (11th Cir. 2016) (emphasis in original). *See also Shaw v. United States*, 580 U.S. 63, 72 (2016) (construing "scheme to defraud" in a bank fraud case and holding that "the scheme must be one to deceive the bank *and* deprive it of something of

value.") (emphasis in original); *United States v. Regent Office Supply Co.*, 421 F.3d 1174, 1180 (2d Cir. 1970) ("[T]he government can[not] escape the burden of showing that some actual harm or injury was contemplated by the schemer."); *Greenlaw*, 84 F.4th at 339 ("As for the 'intent to defraud' element, the Government must prove an intent to (1) deceive, and (2) cause some harm to result from the deceit.") (internal quotation marks and citation omitted); *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020) ("[W]ire fraud requires the intent to deceive *and* cheat—in other words, to deprive the victim of money or property by means of deception.") (emphasis in original). As the Eleventh Circuit has made clear, "if a defendant does not intend to harm the victim—'to obtain [from the victim], by deceptive means, something to which the defendant is not entitled'—then he has not intended to defraud the victim." *Takhalov*, 827 F.3d at 1313 (quoting *Bradley*, 644 F.3d at 1240). Therefore, "a schemer who tricks someone to enter a transaction has not 'schemed to defraud' so long as he does not intend to harm the person he intends to trick. And this is so even if the transaction would not have occurred but for the trick." *Takhalov*, 827 F.3d at 1313.

The indictment's allegations are wholly insufficient under these precedents: they do not allege an intent to harm by depriving a victim of money or property, and they do not allege a misrepresentation as to the nature of any bargain. Instead they allege, at most, a scheme to deceive—a scheme "to mislead Austal Limited's shareholders and the investing public about Austal USA's financial condition and the performance of the LCS program." Doc. 1 (Indictment), PageID.5 at ¶ 14.

As an initial matter, the indictment does not specifically allege any intent to cause injury. There is no allegation that the defendants intended to "deprive the victim of money or property." *Miller*, 953 F.3d at 1103. Nor does the indictment allege that the defendants intended any other

specific harm to Austal Limited's shareholders and the investing public, except to mislead them. *See, e.g.*, *United States v. Bobo*, 344 F.3d 1076, 1084 (11th Cir. 2003) (reversing district court's denial of motion to dismiss indictment and vacating convictions where the indictment "fail[ed] to specify of what precisely [the defendant] was allegedly trying to defraud the [victim]").

Further, the scheme alleged is not a "scheme to defraud" under the framework established by the Eleventh Circuit. *Takhalov* explains that "a 'scheme to defraud,' as that phrase is used in the wire-fraud statute, refers only to those schemes in which a defendant lies about the nature of the bargain itself." 827 F.3d at 1313. *United States v. Shellef*, a Second Circuit case discussed approvingly in *Takhalov*, is instructive. In that case, the Second Circuit held an indictment legally insufficient where the indictment "fail[ed] to allege that Shellef misrepresented 'the nature of the bargain.'" 507 F.3d 82, 109 (2d Cir. 2007) (citing *Regent Office*, 421 F.2d at 1179). According to the indictment against Shellef, he had "induced [the victim] to sell additional amounts of virgin CFC-113 to [Shellef's company] that it would not have sold had it known that Shellef in fact intended to sell the product domestically." *Id.* at 107. But that allegation was insufficient to state a wire fraud offense, because the indictment did not additionally "assert that Shellef's misrepresentation had 'relevance to the object of the contract.'" *Id.* at 109 (citing *United States v. Starr*, 816 F.2d 94, 100 (2d Cir.1987)).

The indictment here does not allege that the misrepresentations at issue were intended to induce investors or Austal USA to enter any bargain with the defendants. Unlike *United States v. Wheeler*, 16 F.4th 805, 813 (11th Cir. 2021), where the defendants misled investors in order to induce them to buy stock in two companies, with the investors' money going directly to the companies, their owners, and the defendant salespeople who made the misrepresentations, here there was no bargain between either the defendants or their employer and the shareholders, because

21

the shareholders did not pay the defendants or Austal for their shares.  And critically, like in *Shellef*, this indictment does not state that the defendants' alleged deception regarding estimates of future costs to construct LCS ships went to the nature of any bargain.  Far from setting forth a scheme whereby "Bob promised to pour the man a glass of Pappy Van Winkle but gave him a slug of Old Crow instead," the indictment here does not identify the parties to any bargain, the thing bargained for, or the relationship of the alleged misrepresentation to the nature of the bargain.  *Takhalov*, 827 F.3d at 1313.  It only identifies a deceit, and a scheme to deceive does not violate the wire fraud statute.

**B.    The indictment does not allege a scheme to obtain anything.**

The indictment is also insufficient in that it does not allege an intent by the defendants to *obtain* anything to which they were not entitled.  *See United States v. Watkins*, 42 F.4th 1278, 1282 (11th Cir. 2022) ("Under our precedent, a defendant intends to defraud when he 'attempt[s] to obtain, by deceptive means, something to which he was not entitled.'" (quoting *Bradley*, 644 F.3d at 1240)).  *See also Takhalov*, 827 F.3d at 1313.  A scheme to defraud requires intent in two forms, which are distinct sides of the same coin.  It requires, as discussed above, an intent to harm the victim by depriving him of money or property.  It also requires an intent by the defendant to obtain the victim's money or property.  *See Kelly,* 590 U.S. at 404 ("Because the scheme here did not aim to obtain money or property, Baroni and Kelly could not have violated the federal-program fraud or wire fraud laws."); *Carpenter*, 484 U.S. at 25 (that a scheme be one to "obtain any 'money or property' . . . is a necessary element of the crime under our decision last Term in *McNally v. United States*"); *Cleveland*, 531 U.S. at 26 ("We conclude that § 1341 requires the object of the fraud to be 'property' in the victim's hands . . . ."); *Barrow*, 109 F.4th at 526 ("The elements of wire fraud are (1) formation of a scheme to defraud to get money or property . . . ." (internal quotation marks omitted) (citing *United States v. Lemire*, 720 F.2d 1327, 1334-35 (D.C. Cir. 1983))); *Walters*, 997

F.2d at 1224 ("Section 1341 condemns 'any scheme or artifice to defraud, or *for obtaining* money or property' (emphasis added).").

This is so, *first*, because the statute's language makes the offense applicable only to those who "having devised or intending to devise any scheme or artifice to defraud, or for *obtaining* money or property by means of false or fraudulent pretenses, representations, or promises" use the wires for the purpose of executing their scheme.   18 U.S.C. § 1343 (emphasis added).   As the Supreme Court explained in *McNally*, the "or" preceding "for obtaining" does not signify that the statute contemplates two independent types of scheme, one aimed at defrauding and the other at obtaining something via false representation.  *McNally*, 483 U.S. at 358.  Rather, the latter phrase "simply made it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property."  *Id*. at 359.  A scheme to defraud, therefore, is one that is intended to obtain money or property.[5]

*Second*, because a deprivation that is merely an incidental byproduct of a scheme is insufficient to establish a scheme to defraud, "only a scheme to obtain money or property from the victim by fraud violates § 1341" (and, by extension, § 1343, *see supra* n.2).  *Walters*, 997 F.2d at 1227.  If the intent to cause a loss was the only intent required, then foreseen but incidental deprivations would be sufficient to support wire fraud charges.  Precedent makes clear this is not the case.  "A deprivation is a necessary but not a sufficient condition of mail [or wire] fraud.

---

[5] The government recently emphasized this very requirement in a merits brief before the United States Supreme Court.  *See* Brief for the United States at 9, *Kousisis v. United States*, No. 23-909 (S. Ct. Oct. 2, 2024) ("[T]he wire-fraud statute requires only that the scheme have the object of 'obtaining' money or property from the victim, 18 U.S.C. 1343 . . . .").  *See also id.* at 20 (explaining that "[f]rom the time Congress enacted the first mail-fraud statute in 1872, to its addition of the 'obtaining money or property' language in 1909, to its enactment of the wire-fraud statute in 1952, the ordinary meaning of 'obtain' has been '[t]o get hold of by effort; to get possession of; to procure; to acquire, in any way.'") (citations omitted).

23

Losses that occur as byproducts of a deceitful scheme do not satisfy the statutory requirement." *Id*. *See also Kelly*, 590 U.S. at 402 ("[A] property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme."). Requiring a concomitant intent to obtain ensures that the intent to deprive is not incidental to the scheme.

Applying these principles to the case at hand illuminates the insufficiency of the indictment. The defendants are not alleged to have schemed to obtain anything to which they were not entitled, nor are they are alleged to have schemed to obtain anything for a third party. The sole reference to a potential gain is the indictment's allegation that the scheme was conducted, in part, in order to unjustly enrich the defendants through the "continued receipt" of their "compensation, stock, and other benefits." Doc. 1 (Indictment), PageID.5 at ¶ 14. But the words "continued receipt" establish that the defendants were already entitled to that compensation prior to their purported deception, and the indictment does not allege otherwise. For these reasons, it is apparent that the indictment has not alleged a scheme to obtain money or property.

### C.     With regard to the allegation about defendants' compensation and benefits, the indictment does not allege convergence.

To the extent that the indictment alleges that the purpose of the scheme was to mislead investors in order for the defendants to maintain their salaries and benefits, the indictment fails to allege that the parties deceived by the scheme (shareholders and the investing public) were the same as the party defrauded (the defendants' employer). Doc. 1 (Indictment), PageID.5 at ¶ 14. Because the indictment does not allege convergence between the victim who was deprived of property and the victim who was deceived, the indictment does not state a scheme to defraud with regard to the defendants' continued receipt of compensation, stock, and benefits.

Under the principle of convergence, the wire fraud statute does not extend to schemes in which the party that is deceived differs from the party that is defrauded. This is so because to

"defraud" refers "to wronging one in his property rights by dishonest methods or schemes." *McNally*, 483 U.S. at 358 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)). *See also Cleveland*, 531 U.S. at 15 ("[F]or purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim."); *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989) ("[T]he intent [of the scheme to defraud] must be to obtain money or property from the one who is deceived."); *United States v. Ali*, 620 F.3d 1062, 1070 (9th Cir. 2010) ("*Cleveland* requires that the property taken be property 'in the hands of the victim,' suggesting that at least some level of convergence between the fraud and the loss is required.") (internal citation omitted). Some courts have rejected the convergence requirement. *See, e.g.*, *United States v. Porat*, 76 F.4th 213, 223 (3d Cir. 2023) (collecting cases). However, the Eleventh Circuit, while it has not explicitly addressed the issue, has applied the convergence requirement and found it to be satisfied in a mail fraud case. *See United States v. Bailey*, 123 F.3d 1381, 1390 n.12 (11th Cir. 1997) ("Significantly the IRS and H & K were deceived as well as defrauded. . . . Therefore, [Bailey's] conviction actually satisfies the standard announced in *Lew* that 'the intent must be to obtain money or property from the one who is deceived.'") (citation omitted). Because, here, there is no convergence, there is no scheme to defraud with regard to the defendants' continued receipt of compensation, and the indictment is insufficient insofar as it relies on that theory.

## III.    The deficiencies in the indictment cannot be cured by greater specificity.

The problem with the indictment is not that it is insufficiently specific; it is that it specifically alleges a scheme that does not violate the wire fraud statute. The charges set out in reasonable detail a scheme *to deceive shareholders and the investing public*. Those allegations, for the reasons already articulated, simply do not state the offenses charged; that is, they do not state wire fraud, wire fraud affecting a financial institution, or conspiracy to commit wire fraud.

The government, indeed, appears now to recognize this deficiency. The criminal information it filed against Austal USA in August 2024 alleges that the company engaged in the same scheme detailed in the indictment here: "to mislead Austal Limited's shareholders and the investing public about AUSTAL USA's financial condition and the performance of the LCS program in order to (a) maintain and increase the share price of Austal Limited's stock; and (b) unjustly enrich senior executives of AUSTAL USA through their continued receipt of compensation, stock, and other benefits." *See United States v. Austal USA, LLC*, Case No. 1:24-cr-00131-JB, Doc. 13, Information, PageID.23 at ¶ 12 (Aug. 26, 2024). However, the company was charged not with wire fraud, but with securities fraud under Title 15 of the U.S. Code. Unlike the wire fraud statute, the Securities Exchange Act of 1934 ("Exchange Act") does not proscribe schemes to defraud a victim of money or property. Rather, it prohibits the use or employment of "any manipulative or deceptive device or contrivance in contravention of" a rule or regulation of the Securities and Exchange Commission, "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b).[6]

The indictment here cannot be rectified. The conduct alleged is not wire fraud, and the case must be dismissed.[7]

---

[6] The government has filed a civil case alleging that the defendants violated the Exchange Act. *See SEC v. Craig D. Perciavalle, Joseph A. Runkel, and William O. Adams*, Case No. 23-cv-00109 (Mar. 31, 2023). The government elected not to bring criminal charges under the Exchange Act.

[7] The indictment's failure to state an offense under 18 U.S.C. § 1343 requires dismissal of the conspiracy count (Count 1) in addition to the substantive wire fraud counts (Counts 2-8). The conspiracy count requires the government to allege that defendants had the requisite intent to defraud, which the indictment fails to do for the reasons discussed herein. *See, e.g.*, *United States v. Ball*, 711 Fed. Appx. 838, 841 (9th Cir. 2017) (explaining that conspiracy to commit wire fraud requires "the requisite intent to commit the substantive crime").

## **CONCLUSION**

For these reasons, the defendants respectfully request that the Court grant the instant joint motion and dismiss the indictment with prejudice.[8]  The defendants respectfully request that the Court hear oral argument on this motion.

---

[8] Where the facts alleged in an indictment do not support the offense charged, a dismissal with prejudice is appropriate.  *See*, *e.g.*, *United States v. Martín-Alfaro*, 553 F. Supp. 3d 1, 4 (D.P.R. 2021); *United States v. Ying Lin*, 270 F. Supp. 3d 631, 635 (E.D.N.Y. 2017); *Berdeal*, 595 F. Supp. 2d at 1334.

Date:  October 18, 2024                    Respectfully submitted,

                                           /s/ *Jack W. Selden*
                                           Jack W. Selden
                                           Bradley Arant Boult Cummings LLP
                                           One Federal Place
                                           1810 Fifth Avenue North
                                           Birmingham, AL 35203
                                           (205) 521-8472
                                           jselden@bradley.com

                                           Gregory G. Marshall (admitted *pro hac vice*)
                                           Erin K. Sullivan
                                           Bradley Arant Boult Cummings LLP
                                           1615 L Street NW, Suite 1350
                                           Washington, DC 20036
                                           (202) 393-7150
                                           gmarshall@bradley.com
                                           esullivan@bradley.com

                                           *Counsel for Craig D. Perciavalle*

                                           /s/ *James R. Sturdivant* (with permission)
                                           James R. Sturdivant
                                           Robert R. Baugh
                                           Alyse N. Windsor
                                           Dentons Sirote PC
                                           2311 Highland Avenue South
                                           Birmingham, AL 35205
                                           (205) 930-5100
                                           jim.sturdivant@dentons.com
                                           robert.baugh@dentons.com
                                           alyse.windsor@dentons.com

                                           *Counsel for Joseph A. Runkel*

                                           /s/ *Frederick G. Helmsing* (with permission)
                                           Frederick G. Helmsing, Jr.
                                           T. Hart Benton III
                                           Jones Walker LLP
                                           11 North Water St., Ste. 1200
                                           Mobile, AL 36602
                                           T: 251.432.1414
                                           F: 251.433.4106
                                           fhelmsing@joneswalker.com
                                           hbenton@joneswalker.com

                                           *Counsel for William O. Adams*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 18, 2024, I electronically filed the foregoing joint motion to dismiss the indictment with the Clerk of the Court using the Court's CM/ECF system.

<u>/s/ *Jack W. Selden*</u>
Jack W. Selden

*Counsel for Craig D. Perciavalle*